OPINION
{¶ 1} Appellant, Thomas A. Kemp, appeals the March 5, 2004, decision of the Mahoning County Court of Common Pleas denying his postconviction petition after an evidentiary hearing.
 {¶ 2} Appellant shot and killed Thomas A. Beno on November 4, 1988, after Appellant learned that Beno married Appellant's stepdaughter earlier in the day. Appellant was initially charged with one count of aggravated murder which included no death specification. Thereafter, Appellant's case was presented to the grand jury, and he was indicted on a total of six counts. The charged offenses included two counts of aggravated murder with death specifications, two counts of kidnapping, and two counts of felonious assault. All six counts had attendant firearm specifications.
 {¶ 3} On February 28, 1989, Appellant entered a plea of no contest to the charges in exchange for the state's dismissal of the death specifications. The trial court rendered a guilty finding, and Appellant was sentenced. Appellant subsequently filed a timely petition for postconviction relief, which was summarily dismissed by the trial court. Appellant appealed that decision.
 {¶ 4} This Court reversed and remanded the matter, concluding that the trial court should have considered Appellant's motion in opposition to the state's summary judgment motion since it was filed within the Civ.R.56(C) time limit. State v. Kemp (1999), 7th Dist. No. 97 CA 123. This Court also concluded, "[g]iven that appellant supplied the necessary documents and affidavits demonstrating that his defense attorney represented him under a possible conflict of interest," he met at least the threshold necessary to entitle him to an evidentiary hearing. Id. at 3.
 {¶ 5} On remand, Appellant was afforded an evidentiary hearing. The trial court again denied his postconviction petition. (March 5, 2004, Judgment Entry, pp. 2-3.) Appellant, pro se, timely asserted three assigned errors on appeal. Thereafter, the Ohio Public Defender's Office filed a Supplemental Brief in support of Appellant's second claimed error on appeal.
 {¶ 6} Appellant's first assignment of error claims:
 {¶ 7} "The trial court erred to Appellant's detriment in denying Appellant's motion to strike the state's untimely `Post Hearing Brief' wherein the court's judgment entry suggests, in part, that the trial court utilized the state's legal theories and/or research in overruling Appellant's petition."
 {¶ 8} This issue concerns briefs that were to be submitted by the parties following Appellant's postconviction evidentiary hearing. Appellant claims that the trial court erred in considering the state's post hearing brief since it was filed after the deadline.
 {¶ 9} At the conclusion of the June 15, 2001, evidentiary hearing on Appellant's postconviction claims, the trial court ordered Appellant's brief to be filed by July 31, 2001. The state's brief in response was due on August 31, 2001. (June 15, 2001, Tr., p. 131.) Thereafter, Appellant's counsel requested additional time to prepare, and the trial court set new deadlines. Neither side submitted briefs within these new deadlines.
 {¶ 10} In December of 2002 and January of 2003, Appellant filed two motions to proceed on a pro se basis.
 {¶ 11} Thereafter, the court's entry dated April 4, 2003, noted that Appellant's counsel prepared the requisite brief and that he forwarded it to Appellant for review. It was not filed with the court at this time.
 {¶ 12} On April 25, 2003, Appellant filed a motion entitled "Amendment to `Motion to Proceed as a Pro Se Litigant.'" The trial court granted Appellant's requests to proceed on a pro se basis on that same date.
 {¶ 13} On July 10, 2003, the trial court noted in its entry that Appellant had yet to file the requisite brief. Thus, it ordered the matter to be dismissed unless the required filings were made by August 22, 2003. (July 10, 2003, Judgment Entry.)
 {¶ 14} Appellant filed his pro se post hearing brief on July 18, 2003. His counsel subsequently filed a post hearing brief on Appellant's behalf on August 14, 2003.
 {¶ 15} Appellant requested that the trial court decide the matter without the state's brief as it had yet to be filed. (Aug. 25, 2003, Motion to Proceed with Defendant's Brief on an Un-contested Basis.) Appellant also asked the court to disregard his counsel's brief.
 {¶ 16} Thereafter, the record reflects that Appellant filed a pro se "writ for a summary judgment" on November 3, 2003.
 {¶ 17} On February 6, 2004, the state filed a memorandum in opposition to Appellant's post hearing brief without requesting leave of court. Appellant asked the trial court to strike the state's memorandum in opposition.
 {¶ 18} On March 5, 2004, the trial court overruled Appellant's pending motions, including his postconviction petition. While they were not specifically listed, the other pending motions addressed were, presumably, Appellant's request for the trial court to disregard his counsel's brief, Appellant's motion for summary judgment, and his request for the trial court to proceed as if the matter was uncontested as well as his motion to strike the state's reply brief.
 {¶ 19} Appellant now asserts that the trial court should have disregarded the state's February 6, 2004, memorandum in opposition, which was filed almost six months after Appellant's pro se brief.
 {¶ 20} In support of this argument, Appellant directs this Court's attention to State v. Wiles (1989), 126 Ohio App.3d 71, 77-78,709 N.E.2d 898. Appellant argues that the state's brief should have been stricken since it was not filed within the ten-day time limit set forth in R.C. § 2953.21(D), as was the case in Wiles.
 {¶ 21} However, the ten-day filing deadline set forth in R.C. §2953.21(D) only applies to a response to the initial petition for postconviction relief. This rule does not apply to subsequent motions and filings throughout the postconviction proceedings.
 {¶ 22} Further, a trial court has broad discretion in matters such as accepting untimely filings. State v. Gunther (1998), 125 Ohio App.3d 226,236, 708 N.E.2d 242. An abuse of discretion connotes more than an error of law or judgment; it implies the trial court's attitude was unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 5 OBR 481, 450 N.E.2d 1140.
 {¶ 23} The trial court explained its decision to accept the state's memorandum in opposition in its judgment entry. It reasoned that Appellant had to have recognized that his postconviction claims of a conflict of interest were "negated" after the evidentiary hearing. Thus, the trial court believed that Appellant was trying to create a new conflict with his postconviction counsel. The trial court concluded that it was this new claimed conflict combined with Appellant's pro se filings that were at the center of the lengthy delays. (March 5, 2004, Judgment Entry, pp. 2-3.)
 {¶ 24} The trial court noted that both counsel were dilatory in filing the requisite briefs. It also held that the state's late response was excused since it was a result of, "personal problems and confusion over whether or not [Appellant] was representing himself or if the Court was going to replace appointed counsel or allow [Appellant] to continue to file pro-se motions." (March 5, 2004, Judgment Entry, p. 4.)
 {¶ 25} Appellant claims that the state should have known to disregard the brief filed on his behalf because the trial court had already granted Appellant's request to proceed on a pro se basis. While Appellant specifically requested the trial court to disregard the brief filed by counsel on his behalf, the trial court did not rule on this motion before the March 5, 2004, Judgment Entry. Thus, the state's confusion over how to proceed relative to the two briefs is apparent.
 {¶ 26} Based on the foregoing, the trial court did not abuse its discretion in accepting the state's brief. The trial court specified what it considered sufficient reasons for the state's delay. Further, the trial court had allowed numerous delays on Appellant's behalf.
 {¶ 27} Thus, Appellant's first assignment of error lacks merit and is overruled.
 {¶ 28} Appellant's second assignment of error asserts:
 {¶ 29} "The trial court erred to Appellant's detriment in dismissing Appellant's Petition when the trial court used the wrong legal standard in determining whether counsel was laboring under divided loyalties which adversely affected the defense."
 {¶ 30} Pursuant to R.C. § 2953.21(A)(1)(a), a person convicted of a criminal offense who asserts a violation of his or her constitutional rights may petition the court that imposed the sentence for appropriate relief. A postconviction petition is not an appeal of the underlying matter; instead, it is a civil action that collaterally attacks a criminal judgment. State v. Steffen (1994), 70 Ohio St.3d 399, 410,639 N.E.2d 67. Postconviction review is not a constitutionally protected right, even in capital cases. Thus, the petitioner only receives those rights established by statute. Id.
 {¶ 31} Postconviction relief may be granted only where the petitioner demonstrates that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the United States Constitution. R.C. § 2953.21(A).
 {¶ 32} Postconviction review provides a narrow remedy because res judicata bars any claim that was or could have been raised at trial or on direct appeal. State v. Perry (1967), 10 Ohio St.2d 175, 180,39 O.O.2d 189, 226 N.E.2d 104; State v. Duling (1970), 21 Ohio St.2d 13,254 N.E.2d 670, paragraph two of the syllabus. This Court has previously held that Appellant's claims of ineffective assistance of counsel are not barred by the doctrine of res judicata since Appellant's trial counsel also represented him in his direct appeal. State v. Kemp (1999), 7th Dist. No. 97 CA 123, 2.
 {¶ 33} The crux of Appellant's postconviction petition is that he was denied his constitutional right to the effective assistance of counsel based on his trial counsel's conflict of interest. The alleged conflict of interest is based in part on his trial counsel's decision to perform legal services for his stepdaughter, Lori Kemp-Campana, a.k.a. Lori Beno and Lori Elder. Lori was widowed when Appellant killed her husband of less than one day, Thomas A. Beno. She was also identified as a victim of some of Appellant's offenses in the indictment.
 {¶ 34} Where there is a right to counsel, the Sixth Amendment to the United States Constitution also guarantees that representation will be free from conflicts of interest. State v. Gillard (1992),64 Ohio St.3d 304, 312, 595 N.E.2d 878.
 {¶ 35} The United States Supreme Court in Cuyler v. Sullivan (1980),446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333, held that where no objection is raised before the trial court, the defendant bears the burden of demonstrating on appeal an actual conflict of interest that adversely affected his Sixth Amendment right to counsel. Id. at 348. "[T]he possibility of conflict is insufficient to impugn a criminal conviction." Id. at 350; see also State v. Walker (1998), 130 Ohio App.3d 247, 251,719 N.E.2d 1042.
 {¶ 36} The burden of proof in a conflict case, a showing that counsel's conflict adversely affected his or her performance, is derived from the United States Supreme Court's decision in Cuyler, supra, and, "is less demanding than the Strickland standard, which requires a demonstration that counsel's inadequate performance undermined the reliability of the verdict." State v. Tucker, 1st Dist. No. C-020821,2003-Ohio-6056, ¶ 28, citing State v. Dillon (1995), 74 Ohio St.3d 166,169, 657 N.E.2d 273.
 {¶ 37} The obvious example of a conflict of interest is the representation of clients with incompatible interests. State v. Manross
(1988), 40 Ohio St.3d 180, 182, 532 N.E.2d 735.
 {¶ 38} "An `actual, relevant conflict of interests' exists `if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue.' In such a case, counsel's duty to one client `tends to lead to disregard for another.'" (Citations omitted.) Dillon, supra, at 169.
 {¶ 39} The Ohio Supreme Court in State v. Gillard (1997),78 Ohio St.3d 548, 552-553, 679 N.E.2d 276, explained the difference between a possible and an actual conflict of interest. "A possible
conflict of interest exists where the `"interests of the defendants may
diverge at some point so as to place the attorney under inconsistent duties."'" (Emphasis in original.) (Citations omitted.) Id. at 552.
 {¶ 40} In order to demonstrate an actual conflict based on what an attorney has failed to do, a defendant must prove first that a viable and plausible alternative defense strategy might have been pursued, and second that the alternative defense was inherently in conflict with or not pursued due to the attorney's other loyalties or interests. Id. at 553. "[A] lawyer represents conflicting interests `when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.'" (Citation omitted.) Id.
 {¶ 41} "The trial court has `wide latitude' in determining whether an actual conflict of interest existed." State v. Pelphrey,149 Ohio App.3d 578, 2002-Ohio-5491, 778 N.E.2d 129, ¶ 13, citingState v. Keenan (1998), 81 Ohio St.3d 133, 137, 689 N.E.2d 929.
 {¶ 42} In the matter before us, Appellant first alleges that the trial court failed to apply the appropriate test set forth in Cuyler, supra. Appellant is correct that the trial court did not specifically conclude that Appellant's trial counsel did not act under an actual conflict of interest. However, the trial court concluded that Appellant's conflict of interest claim was negated. The trial court stated:
 {¶ 43} "It appears to the Court that Defendant-Petitioner, following incarceration subsequent to his determination of Guilt, has grasped at any cause possible in his efforts to negate the performance of counsel that had been appointed by the Court to represent him in the most serious of criminal allegations.
 {¶ 44} "It further appears to this Court that upon this Court having conducted a full hearing allowing testimony of all concerned parties including Defendant, Defendant's wife, Defendant's step-daughter (wife of deceased victim), defense counsel involved, and after having heard the examination and cross examination of all persons involved, Defendant realized the testimony taken * * * clarified that Defendant-Petitioner's allegations of conflict of interest were negated." (March 5, 2004, Judgment Entry, pp. 2-3.)
 {¶ 45} Thereafter, the trial court concluded that Appellant was not prejudiced by the alleged conflict of interest. The court also stressed that Appellant was represented by two attorneys. (March 5, 2004, Judgment Entry, pp. 3-4.)
 {¶ 46} As Appellant points out, the trial court erroneously concluded that Appellant was not "prejudiced" as a result of the alleged conflict of interest. The trial court should have determined whether counsel's performance was "adversely affected" by the conflict of interest. Cuyler,
supra.
 {¶ 47} In spite of the trial court's apparent error in not correctly applying the second Cuyler prong, the trial court did not need to address this second aspect of the test, as it had already concluded that no actual conflict of interest existed. Even if the trial court used the incorrect standard, this possible error was included in a portion of the decision that can be considered mere dicta. Once the court determined that no conflict existed, it should have stopped there in its decision. Obviously, counsel's performance cannot be adversely affected by a conflict of interest that does not exist.
 {¶ 48} Based on the foregoing, it does appear that the trial court employed the incorrect standard in assessing a portion of Appellant's conflict of interest claim. However, the trial court had already found that there was no conflict of interest, and a trial court has "wide latitude" in determining whether an actual conflict of interest exists.Keenan, supra. As such, the trial court's further discussion as to whether Appellant was prejudiced is of no consequence.
 {¶ 49} Appellant also asserts under this assignment that the trial court erred since the evidence demonstrated that Appellant was denied the effective assistance of counsel due to his trial counsel's conflict of interest.
 {¶ 50} Appellant relies to some extent on this Court's prior decision to support this claim. Appellant, however, takes this Court's Opinion out of context. In analyzing Appellant's ineffective assistance of counsel claim, this Court noted:
 {¶ 51} "[A]ppellant put forth evidence indicating that his defense attorney represented [Lori], a prosecution witness, in a number of legal matters including a name change, the filing of a real estate deed, and in a simple probate action. Appellant also demonstrated that his defense attorney and [Lori] maintained a personal relationship. [Lori's] interest was adverse to his because she was widowed after appellant shot and killed her husband." State v. Kemp (1999), 7th Dist. No. 97 CA 123, 3.
 {¶ 52} However, our summary of the alleged facts was limited to deciding whether there was any evidence in the record sufficient to preclude granting a motion for summary judgment and to warrant a postconviction evidentiary hearing.
 {¶ 53} Turning to the facts introduced at his postconviction hearing, we glean the following:
 {¶ 54} Attorney Michael Morley was appointed to represent Appellant. Thereafter, and with the addition of the death specifications, Attorney J. Gerald Ingram was added as co-counsel since Morley was not certified to handle death specification cases.
 {¶ 55} Appellant claims that Morley advised him not to discuss his case with Ingram. This claim is apparently designed to contradict the fact that the trial court underscored that Appellant had two trial counsel in denying his postconviction petition.
 {¶ 56} Ingram testified that he believed that Appellant listened to Attorney Morley, not to him. However, Ingram recalls that he was the one who actually negotiated Appellant's plea agreement. He does not believe that he ever advised Appellant not to sign the plea agreement. (Tr. pp. 11, 18-19.)
 {¶ 57} The main crux of Appellant's conflict of interest claim is founded on Morley's relationship as Appellant's counsel as well as counsel for a victim of Appellant's offenses. Appellant argues that Morley and Lori wanted Appellant to accept a plea agreement that would put him in prison for life.
 {¶ 58} Appellant's wife Bonnie and Lori were evidently both in the room when Appellant shot Beno. The charged offenses relative to Bonnie and Lori were kidnapping and felonious assault. It should be noted that Appellant does not assert a conflict of interest based on Morley's relationship with Bonnie.
 {¶ 59} Morley testified that he repeatedly met with Bonnie and Lori as contact persons for the case even though they were both named as victims of several of Appellant's charged offenses. Morley testified that it was Appellant who directed him to deal with Bonnie and Lori.
 {¶ 60} Lori testified at the hearing that Morley advised her that it was okay for her, as the widow of the victim, to participate in Appellant's defense. (Tr. p. 75.) Lori stated that she dealt with Morley most often because her mother did not understand the nature of the discussions. (Tr. p. 76.)
 {¶ 61} In addition, it can be argued that Morley represented Lori on three separate occasions. First, Morley apparently wrote a letter on Lori's behalf in response to a letter that she received from Beno's estate. (Tr. pp. 82-83.) Morley also added Lori's name to the title of Appellant's residence. Appellant testified that he asked Morley to add Lori's name to the deed of his home. (Tr. p. 96.)
 {¶ 62} Morley also represented Lori in changing her name from Lori Beno, the decedent's last name, to Lori Kemp, Appellant's last name. (Tr. pp 30-31.)
 {¶ 63} Appellant directs this Court's attention to the fact that Lori cooperated with the state by testifying at Appellant's grand jury hearing. (Tr. p. 80.) Lori did not testify at Appellant's trial since he signed a plea agreement.
 {¶ 64} Appellant also claims that Morley had a personal relationship with Lori. Bonnie testified that she had Morley at her home for dinner four or five times, while Ingram was only at the house once. Bonnie also recalled that Morley called the house and asking for Lori. Morley also gave Lori tickets to see him perform in a local play. Bonnie, Lori, and their neighbor went to the play. Bonnie also said that Morley allowed Lori to drive his Porsche. (Tr. pp. 59-61)
 {¶ 65} However, Lori testified that she never met Morley socially. (Tr. pp. 78, 80.)
 {¶ 66} Appellant also claims that Morley asked Lori to urge Appellant to sign the plea agreement. Aside from Appellant's testimony as to this secondhand conversation, there is no other testimony as to Lori's participation or lack thereof. However, Bonnie testified that Morley enlisted her help in getting Appellant to accept the plea agreement. (Tr. p. 68.)
 {¶ 67} Further, Morley testified that Bonnie and Lori had Appellant's best interests in mind. Morley stated that Lori did not behave like a victim. (Tr. pp. 27, 29, 33, 35, 39.) Morley believed that his relationship with Lori and Bonnie helped Appellant's case. (Tr. pp. 41-42.) Morley believes that Appellant's plea was in his best interest. (Tr. p. 45.)
 {¶ 68} It should also be noted that Bonnie testified that Lori was not upset with Appellant for killing her husband, and that Lori attended and supported Appellant at all of his hearings. Bonnie also stated that Lori was more Appellant's daughter than the decedent's wife. (Tr. pp. 64-66.)
 {¶ 69} Ingram likewise testified that the decedent's widow was more favorable to the defense. He specifically recalled that Lori was interested in minimizing Appellant's prison term. (Tr. p. 21.)
 {¶ 70} The prosecutor handling this case at the time of Appellant's plea also testified at the postconviction hearing. He recalled hearing rumors that Lori was not going to cooperate with the prosecutor's office. The prosecutor also recalled hearing unsubstantiated rumors that Lori may have actually been "in on" Beno's murder. He also recalled examining the prison's visitor log and noting that Lori was Appellant's most frequent visitor. He remembered that Lori sat on the defense side of the courtroom at each hearing. (Tr. pp. 118, 121-122.)
 {¶ 71} Notwithstanding the foregoing, Appellant asserts that Morley testified that his relationship with Lori and Bonnie compromised Appellant's case. While the record reflects that Morley did answer a question to this affect in the affirmative, he also testified to the contrary. It appears that Morley may have not comprehended the question presented. Morley testified on cross-examination:
 {¶ 72} "Q After reviewing the evidence, in your opinion was that a fair plea agreement in your client's best interest at the time it was entered?
 {¶ 73} "A Definitely. I think we saved his life.
 {¶ 74} "Q Do you feel you compromised the defense in any way by having a close relationship with Lori Beno and Bonnie Kemp?
 {¶ 75} "A Definitely. I consider them my clients.
 {¶ 76} "* * *
 {¶ 77} "Q Again, you said it was at [Appellant's] directive that you developed this close relationship with his wife and stepdaughter?
 {¶ 78} "A Yeah. They were — they were all the victims. Like, he would say, okay, I want to talk to you, but I also want to talk to them. Can you be at the house at such and such a time? And we would do a telephone conference or whatever. * * *
 {¶ 79} "Q And isn't it fair to say that by developing a close relationship, if anything, would help not hurt [Appellant's] case; correct?
 {¶ 80} "A Yes. I thought of them as clients, quite frankly. * * * but that was very typical of most of my client relationships." (Tr. pp. 40-42.)
 {¶ 81} The testimony presented at Appellant's postconviction hearing on remand raised the possibility of a conflict of interest since Lori is the decedent's widow and she was a named victim of two other offenses. However, mere possibility of a conflict of interest is insufficient to negate a criminal conviction. Cuyler, supra, at 350.
 {¶ 82} Appellant must establish an actual conflict of interest. The claimed conflict in the instant cause which would give rise to a constitutional problem is purely speculative. Appellant theorizes that Morley and Lori were working together to get Appellant to accept a plea agreement that would put him in prison for life. This theory is unsubstantiated by any evidence. All of the witnesses' testimony, except Appellant's, supports that Lori was acting with Appellant's best interests in mind. Lori even testified that she wanted Morley to do the best job possible in representing her stepfather. (Tr. p. 86.) Further, no one testified that Appellant's plea agreement was a "bad deal."
 {¶ 83} There is nothing in the record indicating that Morley and Lori had anything but Appellant's best interests in mind. For the most part, Appellant admits that he, himself, got Lori involved with his representation. Appellant's self-serving and unsubstantiated assertions that the two ultimately worked against him are insufficient to establish an actual conflict of interest.
 {¶ 84} Even assuming that an actual conflict of interest existed, the Appellant must prove that the conflict adversely affected Morley's representation.
 {¶ 85} Appellant alleges that he was adversely affected in two ways based on the claimed conflict of interest. First, Appellant asserts that Morley and Lori urged him to accept the plea agreement so he would have to spend the rest of his life in prison. The only testimony offered in support of this claim is Lori's statement that Appellant needed to be punished. (Tr. p. 78.) However, this was more of a statement of Lori's understanding that Appellant's conduct needed punished and not her desire to see him punished. Lori testified on direct examination:
 {¶ 86} "Q During the course of the events after November 4, 1998, would you say your allegiance was with your deceased husband or stepfather?
 {¶ 87} "A I think my allegiance was with both of them. I was — I mean, I just lost my husband.
 {¶ 88} "Q Understood. How did you feel about [Appellant]?
 {¶ 89} "A He was my stepfather, I mean.
 {¶ 90} "Q You didn't want to see him go to jail?
 {¶ 91} "A I knew he had to go to jail. I understand that he did something wrong, and I knew * * * he needed to be punished. * * *" (Tr. p. 78.)
 {¶ 92} Contrary to Appellant's assertions, the record reflects that Lori wanted to minimize her stepfather's prison time and that she supported him throughout the proceedings.
 {¶ 93} Further, this Court concluded in its prior decision under a different claim by Appellant of ineffective assistance that:
 {¶ 94} "[A]ppellant entered into plea negotiations whereby he agreed to plead no contest to the charges in exchange for the prosecutor agreeing to drop the attendant death penalty specifications on the aggravated murder charges. This negotiation was fair because it prevented appellant from possibly facing the death penalty. Although appellant received life imprisonment for the charges, which may not have been the result he had hoped to receive, this court may not use the benefit of hindsight to find that appellant received ineffective assistance of counsel." Kemp, supra, at 4.
 {¶ 95} Appellant's second alleged adverse affect is based on Appellant's supposition that Lori intended to file a wrongful death case against him. However, there is absolutely no evidence supporting that contention. In fact, Lori testified that she and Morley never discussed the possibility of a civil action against Appellant resulting from Beno's murder. (Tr. p. 82.)
 {¶ 96} Further, Appellant pleaded no contest to his criminal charges. He is apparently unaware that, unlike a guilty plea, a no contest plea is inadmissible as evidence of the defendant's guilt of the crime in a subsequent civil action. Evid.R. 410; R.C. § 2937.07. Had Morley and Lori intended to pursue a wrongful death claim against Appellant, they would have likely urged him to sign a guilty plea, which would be admissible in a subsequent civil action. State v. Snyder (1952), 157 Ohio St. 15,104 N.E.2d 169, 47 O.O. 24; Wilcox v. Gregory (1960), 112 Ohio App. 516,176 N.E.2d 523.
 {¶ 97} The Eleventh District Court of Appeals in State v. Petrowski
(2001), 11th Dist. No. 99-A-0019, considered an issue similar to the one before this Court. The alleged conflict in Petrowski concerned counsel's dual representation of the defendant and the victim of his assault conviction, i.e., his wife. The facts in Petrowski revealed that the defendant's counsel was not representing the victim-wife in his criminal case. However, defendant's counsel was representing the victim-wife as her defense counsel in an unrelated criminal proceeding. The court held that the defendant's conflict of interest argument lacked merit since his counsel's relationship with the victim-wife did not adversely affect his performance. In fact, the court noted that the victim-wife's relationship with the defendant's attorney likely helped defendant's case since she did not testify at his trial. Id. at 3.
 {¶ 98} Assuming there was an actual conflict of interest in Morley's representation of Lori, there was no adverse affect in Morley's performance. As in Petrowski, supra, there is nothing in the record indicating that Appellant's and Lori's interests diverged placing Morley under inconsistent duties. In fact, the evidence supports that Morley's relationship with Lori likely worked to Appellant's advantage.
 {¶ 99} Based on the foregoing, this Court finds no actual conflict of interest adversely affecting trial counsel's performance and overrules all aspects of Appellant's second assignment of error.
 {¶ 100} Appellant's final assignment of error asserts:
 {¶ 101} "The trial court erred to Appellant's detriment in dismissing Appellant's Petition when the trial court made unsubstantiated conclusions that had nothing to do with the matters in consideration of Petitioner's claims of ineffective assistance of counsel."
 {¶ 102} Appellant in this assigned error attacks the trial court's judgment entry for setting forth findings relative to Appellant's other pending motions.
 {¶ 103} As earlier discussed, Appellant had several outstanding motions at the time the trial court issued its entry at issue in this appeal. The motions included Appellant's request for the trial court to disregard his counsel's brief, Appellant's motion for summary judgment, and his request for the trial court to proceed as if the matter was uncontested as well as his motion to strike the state's reply brief.
 {¶ 104} These motions were all overruled by the March 5, 2004, entry even though the trial court did not address each pending motion by name. A pending motion is impliedly overruled when a trial court enters judgment without expressly determining the specific motion. Maust v.Palmer (1994), 94 Ohio App.3d 764, 769, 641 N.E.2d 818.
 {¶ 105} Here, the trial court did state that Appellant's pending motions were overruled, even though it did not specifically list them. Certainly, if a court can implicitly overrule pending motions upon entering judgment, it can explicitly overrule them within that judgment. The trial court was well within its discretion in considering Appellant's other pending motions in the same entry as its denial of his postconviction petition. As such, the trial court's brief references to the facts surrounding the other pending motions were not in error.
 {¶ 106} Appellant's third assignment of error simply restates the arguments set forth and previously addressed in his second assignment of error, i.e., his ineffective trial counsel based on the alleged conflict of interest. We will not readdress those arguments herein.
 {¶ 107} Appellant's third assignment of error lacks merit and is overruled.
 {¶ 108} Based on the foregoing, the trial court's judgment is hereby affirmed in its entirety.
Vukovich, J., concurs.
DeGenaro, J., concurs.