OPINION
{¶ 1} Defendant-appellant, Nawaz Ahmed, appeals from a Belmont County Common Pleas Court judgment denying his motion for postconviction relief.
 {¶ 2} The facts of this case are taken from appellant's direct appeal to the Ohio Supreme Court. State v. Ahmed, 103 Ohio St.3d 27,813 N.E.2d 637, 2004Ohio-4190, at ¶ 1-21.
 {¶ 3} "On the afternoon of September 11, 1999, Belmont County Sheriff deputies discovered the bodies of Dr. Lubaina Ahmed, Ruhie Ahmed, Nasira Ahmed, and Abdul Bhatti in Lubaina's rental home. Later that night, defendant-appellant, Nawaz Ahmed, was detained before he could depart for Pakistan on a flight from John F. Kennedy International Airport ('JFK') in New York. Appellant was indicted for the aggravated murders of his estranged wife, Lubaina, her father, Abdul, and her sister and niece, Ruhie and Nasira. Appellant was found guilty and sentenced to death.
 {¶ 4} "In October 1998, Lubaina hired an attorney to end her marriage with appellant and to secure custody of their two children, Tariq and Ahsan. According to Lubaina's divorce attorney, appellant did not want a divorce, and consequently, it was a hostile divorce proceeding. In early February 1999, shortly after the complaint for divorce had been filed, Lubaina was awarded temporary custody of the children and exclusive use of the marital residence. Later that month, the divorce court issued a restraining order to prevent appellant from coming near Lubaina or making harassing phone calls to her.
 {¶ 5} "Appellant had accused Lubaina, a physician, of having an affair with another physician, and claimed that their oldest son, Tariq, was not his. A subsequent paternity test showed that claim to be false. According to Lubaina's divorce attorney, Grace Hoffman, Lubaina had been afraid of appellant, and she had called Hoffman three or four times a week, `scared [and] frustrated * * *. It just kept escalating.' Lubaina had also confided to Hoffman that appellant had forced her to have sex with him during the marriage.
 {¶ 6} "Tahira Khan, one of Lubaina's sisters, corroborated that Lubaina had feared appellant. She also testified that Lubaina had told her that appellant had raped her repeatedly.
 {¶ 7} "The owner of the rental home where Lubaina resided testified that Lubaina had called him in February 1999 and asked him to change the locks on the house. He stated that Lubaina had been very upset and had asked that he change them within the hour.
 {¶ 8} "In March 1999, Lubaina complained to police that appellant was harassing her by telephone, but after the officer explained that the matter could be handled through criminal or civil proceedings, she decided to handle it through the ongoing divorce proceedings. The final divorce hearing was scheduled for Monday, September 13, 1999, and Lubaina had arranged for her sister Ruhie to fly in from California the Friday before to testify at the hearing.
 {¶ 9} "On Friday, September 10, 1999, appellant called Lubaina's office several times. But Lubaina had instructed the medical assistants at her office to reject any phone calls from him. Then, at approximately 4:00 p.m. that day, Lubaina took appellant's call. Appellant, who worked and lived in Columbus, wanted Lubaina to bring the children to him for the weekend two hours earlier than planned. Appellant claimed that he was planning a surprise birthday party for their youngest son. Lubaina, however, refused to change her plans and told appellant that he was using the birthday party as an excuse to inconvenience her.
 {¶ 10} "Rafi Ahmed, husband of Ruhie and father of two-year-old Nasira, testified that Ruhie and Nasira had been scheduled to arrive in Columbus from California at 10:34 p.m. on Friday, September 10. Ruhie had planned to call Rafi that night when she arrived at Lubaina's home near St. Clairsville. However, since he had not heard from Ruhie, Rafi began calling Lubaina's home at 1:21 a.m., Saturday, September 11. Rafi called 20 to 25 times, but he got only Lubaina's answering machine. At approximately 3:00 a.m., he called the Belmont County Sheriff's Office.
 {¶ 11} "A parking receipt found in Lubaina's van indicated that the van had entered a Columbus airport parking lot at 9:30 p.m. and exited at 11:14 p.m. on September 10, 1999.
 {¶ 12} "Around 3:45 a.m. on September 11, in response to Rafi Ahmed's call, a sheriff's detective went to Lubaina's home and knocked on the doors and rang the doorbell. She got no answer. The detective also looked in the windows, but nothing at the home appeared to be disturbed.
 {¶ 13} "Later that day, Belmont County Sheriff's Department Detective Steve Forro was assigned to investigate the missing persons. He recognized Lubaina's name because he was the officer who had talked to her regarding appellant's harassing phone calls. Forro called appellant's home to see if he had any information. Appellant did not answer, so Forro called Columbus police to have them check appellant's apartment. They did and found that he was not home.
 {¶ 14} "Forro went to Lubaina's home at 2:18 p.m. As he walked around the outside of the house, he noticed a flicker of a car taillight through a garage window. Using a flashlight, he looked through the window and saw a van with its hatch open and luggage inside. He then saw the body of a man on the floor covered with blood.
 {¶ 15} "Forro called for backup. Deputy Dan Showalter responded and entered through a side door, which he had found unlocked. He searched the house and found three more bodies on the basement floor.
 {¶ 16} "Detective Bart Giesey found appellant's MCI WorldCom employee badge on the basement floor near the bodies. Records from appellant's employer, MCI WorldCom in Hilliard, Ohio, revealed that appellant's badge was last used at 7:19 p.m. on September 10, 1999.
 {¶ 17} "Through several inquiries, police learned that appellant was scheduled to depart from JFK for Lahore, Pakistan, that evening. Earlier that day, appellant, through a travel agent, had booked a flight leaving for Pakistan that same evening. Appellant had made arrangements to pick up the airline ticket at the travel agent's home near JFK. Appellant arrived at the agent's home with both of his sons and asked if he could leave them with the agent, saying that his wife would pick them up soon. Appellant wrote on the back of his and Lubaina's marriage certificate, which he gave to the agent, that he was leaving his sons to be handed over to his wife. Appellant also signed his car over to the agent. The agent then drove appellant to JFK to catch his flight to Pakistan.
 {¶ 18} "At 8:10 p.m., Robert Nanni, a police officer stationed at JFK, learned that appellant was a murder suspect and that he had checked in for a flight scheduled to leave for Pakistan at 8:55 p.m. Appellant was located and arrested. Nanni noticed a large laceration on appellant's right thumb. Nanni read appellant his rights and called airport paramedics to attend to appellant's thumb. Among the items confiscated from appellant was an attaché case containing 15 traveler's checks totaling $7,500, his will, and $6,954.34 in cash.
 {¶ 19} "On October 7, 1999, a grand jury indicted appellant on three counts of aggravated murder for purposely and with prior calculation and design killing Lubaina, Ruhie, and Abdul, pursuant to R.C. 2903.01(A), and one count for the aggravated murder of Nasira, pursuant to R.C. 2903.01(C) (victim younger than 13). All four aggravated murder counts carried a death-penalty specification alleging a course of conduct involving the killing of two or more persons. R.C. 2929.04(A)(5). The aggravated murder count for Nasira carried an additional death-penalty specification alleging that the victim was younger than 13 years at the time of the murder. R.C. 2929.04(A)(9).
 {¶ 20} "At trial, Dr. Manuel Villaverde, the Belmont County Coroner, testified that he had been called to the crime scene on September 11, 1999. All four victims appeared to have died from blood loss from slashes on their necks. Based on the condition of the bodies, he determined that the victims had been killed at approximately 3:00 a.m. that day, with two to four hours' variation either way.
 {¶ 21} "A deputy coroner for Franklin County performed autopsies on all four victims and concluded that each victim had died from skull fractures and a large cut on the neck.
 {¶ 22} "Diane Larson, a forensic scientist at the DNA-serology section of the Bureau of Criminal Identification and Investigation ('BCI'), concluded that the DNA of blood found in the kitchen of Lubaina's home matched appellant's DNA profile. The probability of someone else in the Caucasian population having that same DNA profile is 1 in 7.6 quadrillion, and in the African-American population, the probability is 1 in 65 quadrillion.
 {¶ 23} "After deliberating, the jury found appellant guilty as charged. After the mitigation hearing, the jury recommended death, and the court imposed a death sentence on appellant."
 {¶ 24} Appellant subsequently filed a direct appeal with the Ohio Supreme Court, which affirmed his convictions and death sentence. SeeAhmed, 103 Ohio St.3d 27.
 {¶ 25} In the meantime, appellant filed a petition for postconviction relief in the trial court raising 17 causes of action. Additionally, he filed motions for discovery, voluntary recusal of the trial court judge, a competency evaluation, and funds for an independent psychiatric evaluation. Appellant also requested that the ruling on his petition be stayed pending his requested competency determination.
 {¶ 26} The trial court denied the petition without holding a hearing and entered its judgment on March 8, 2005. Appellant filed a timely notice of appeal on March 28, 2005.
 {¶ 27} Appellant raises six assignments of error, the first of which states:
 {¶ 28} "THE TRIAL COURT ERRED BY DISMISSING APPELLANT'S POSTCONVICTION PETITION, WHERE HE PRESENTED SUFFICIENT OPERATIVE FACTS AND SUPPORTING EXHIBITS TO MERIT AN EVIDENTIARY HEARING AND DISCOVERY."
 {¶ 29} Appellant argues that the trial court erred in failing to hold an evidentiary hearing on his petition before dismissing it. He first contends that his petition raised constitutional issues, contained operative facts to support his grounds for relief supported by evidence, and raised genuine issues of material fact.
 {¶ 30} R.C. 2953.21 governs postconviction proceedings. R.C. 2953.21(C) provides in part:
 {¶ 31} "Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript."
 {¶ 32} In State v. Calhoun (1999), 86 Ohio St.3d 279, 282-83,714 N.E.2d 905, the Ohio Supreme Court held:
 {¶ 33} "According to the postconviction relief statute, a criminal defendant seeking to challenge his conviction through a petition for postconviction relief is not automatically entitled to a hearing.State v. Cole (1982), 2 Ohio St.3d 112, 2 OBR 661, 443 N.E.2d 169. Before granting an evidentiary hearing on the petition, the trial court shall determine whether there are substantive grounds for relief
(R.C. 2953.21[C]), i.e., whether there are grounds to believe that `there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.' (Emphasis added.) R.C. 2953.21(A)(1)."
 {¶ 34} The Court also went on to hold that it is not unreasonable to require the defendant to show in his petition for postconviction relief that the alleged errors resulted in prejudice before a hearing is scheduled. Id. at 283. Therefore, before a hearing is granted, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the merit of his claims.
 {¶ 35} Thus, the trial court must determine if a hearing is warranted based upon the petition, supporting affidavits, and all of the files and records pertaining to the proceedings. State v. Pierce (1998),127 Ohio App.3d 578, 586, 713 N.E.2d 498; State v. Smith (Dec. 11, 1997), 7th Dist. No. 96-JE-44. A trial court's decision regarding whether or not to conduct an evidentiary hearing in postconviction matters is governed by the "abuse of discretion" standard. Smith, 7th Dist. No. 96-JE-44. An abuse of discretion connotes conduct which is unreasonable, arbitrary, or unconscionable. State ex rel. Richard v. Seidner (1996),76 Ohio St.3d 149, 151, 666 N.E.2d 1134.
 {¶ 36} In this case, the trial court did not abuse its discretion in deciding not to hold a hearing on appellant's petition. Appellant does not make any arguments here specific to any of his grounds for relief or the evidence he submitted in support. But later in this opinion, each of appellant's 17 grounds for relief will be discussed in detail. As will be seen, none of appellant's grounds for relief have merit, nor did he show that the alleged errors resulted in prejudice to him. On this basis, the trial court did not abuse its discretion in denying appellant a hearing.
 {¶ 37} Appellant next contends that Ohio's postconviction process fails to protect capital defendants' rights. He asserts that he is entitled to due process, but that R.C. 2953.21 et seq. does not provide him with such. Appellant contends that the statute requires him to prove his claims based solely on his petition, thus mooting the provision in the statute for an evidentiary hearing. He asserts that requiring a petitioner to demonstrate substantive grounds for relief that warrant a hearing, while simultaneously denying access to discovery to clarify those grounds, violates the rights to due process, equal protection, adequate trial and appellate review, and to be free from cruel and unusual punishment.
 {¶ 38} While appellant argues that he was entitled to discovery to protect his constitutional rights, the Ohio Supreme Court and this court have held, "'there is no requirement of civil discovery in postconviction proceedings.'" State v. Twyford (March 19, 2001), 7th Dist. No. 98-JE-56, quoting State ex rel. Love v. Cuyahoga Cty.Prosecutor's Office (1999), 87 Ohio St.3d 158, 159, 718 N.E.2d 426. Furthermore, in Twyford, the defendant argued that R.C. 2953.21 et seq. does not give a criminal defendant a proper procedural mechanism for contesting alleged violations of constitutional rights because the Ohio Supreme Court has placed too many restrictions on the use of the remedy, urging this court to overrule an Ohio Supreme Court decision to the contrary.
 {¶ 39} This court relied on State v. Wiles (1998), 126 Ohio App.3d 71,709 N.E.2d 898, where the defendant argued that the procedure set forth in the postconviction statutes did not provide an adequate remedy because the statutes had been interpreted to have too many technical requirements. In making that argument, the defendant asked the appellate court to ignore an Ohio Supreme Court holding. We noted that theWiles court stated that appellate courts are not free to refuse to follow a Supreme Court decision. Twyford, supra. Likewise, this court concluded we were bound to adhere to the Ohio Supreme Court's holding on the issue raised by the defendant.
 {¶ 40} Similarly, in the case at bar, we must adhere to the Court's holding that postconviction petitioners are not entitled to discovery.
 {¶ 41} Appellant finally contends that the trial court improperly applied the doctrine of res judicata. The trial court held that appellant's first, fifth, seventh, eighth, ninth, tenth, twelfth, thirteenth, and seventeenth grounds for relief were barred by res judicata. He claims that each of these grounds for relief was supported by evidence de hors the record that demonstrated the ground for relief was not capable of being raised on direct appeal or could not have been fully litigated on direct appeal.
 {¶ 42} Once again, later in this opinion, we discuss each of appellant's grounds for relief in detail, including those that the trial court held were barred by res judicata. As will be seen, the court properly dismissed numerous grounds for relief on this basis.
 {¶ 43} Accordingly, appellant's first assignment of error is without merit.
 {¶ 44} Appellant's second assignment of error states:
 {¶ 45} "THE TRIAL COURT ERRED IN NOT PROVIDING RESOURCES TO MR. AHMED TO DETERMINING [sic.] MR. AHMED'S COMPETENCY, FAILING TO EVALUATION [sic.] MR. AHMED'S COMPETENCY, AND TO RENDER AN OPINION AS TO MR. AHMED'S COMPETENCY TO PROCEED IN POSTCONVICTION."
 {¶ 46} Appellant filed motions for a competency evaluation, a request for funds for an independent psychiatric evaluation, and requested that the court delay ruling on his petition pending a competency determination. It appears that the trial court never entered a judgment on these motions.
 {¶ 47} Appellant argues that he has a statutory right to counsel in postconviction proceedings. This right, he argues, would be rendered meaningless if he is unable to assist his counsel. Appellant cites to several federal cases where courts have held that competency is required in habeas corpus proceedings. He analogizes those cases to his, arguing that he has a right to be competent during all collateral proceedings. He also acknowledges that this court has determined that defendants do not have a statutory right to be competent in postconviction. State v.Eley (Nov. 6, 2001), 7th Dist. No. 99-CA-109. However, he argues thatEley only addressed a statutory issue, not a constitutional issue as he raises here. Appellant argues that because there is a serious question as to his competency, the court should have permitted a psychiatric evaluation.
 {¶ 48} Appellant also argues that the Ohio Supreme Court has recognized the right to be competent in postconviction proceedings and cites to State v. Berry (1997), 80 Ohio St.3d 371, 686 N.E.2d 1097, for support.
 {¶ 49} First, it should be noted that the trial court never explicitly ruled on appellant's competency-related motions. However, when a trial court fails to rule on a motion, the motion is considered denied.State v. Collins, 5th Dist. No. 03-CA-103, 2004-Ohio-3645, at ¶ 28. Thus, the trial court implicitly denied appellant's competency-related motions by failing to issue a judgment on them.
 {¶ 50} Second, appellant's statement of our holding in Eley is incorrect. We stated: "We specifically hold a capital defendant is neither statutorily nor constitutionally entitled to a competency hearing as a part of his or her postconviction proceedings." (Emphasis added). Id. We reasoned, in part:
 {¶ 51} "A post-conviction proceeding is not an appeal of a criminal conviction, rather, it is a collateral civil attack on a criminal judgment. Significantly, state post-conviction review is not a constitutional right. Accordingly, in a post-conviction proceeding, a convicted defendant has only the rights granted to him by the legislature.
 {¶ 52} "An example of statutorily granted rights is the right to counsel during post-conviction proceedings. Although an indigent petitioner does not have a state or federal constitutional right to representation by an attorney in a post-conviction proceeding, pursuant to R.C. 120.16(A)(1) and (D), the petitioner is entitled to representation if the public defender concludes the issues raised by the petitioner have arguable merit.
 {¶ 53} "Applying this analysis, we conclude the right to a determination of competency to assist with post-conviction proceedings must be provided for by statute. However, the only time competency is deemed relevant by statute are at the time of the offense and at the time of trial. R.C. 2945.37 and R.C. 2945.371." (Internal citations omitted.) Id.
 {¶ 54} Thus, this court has made clear that a postconviction petitioner is not constitutionally entitled to a competency determination.
 {¶ 55} Third, appellant's reliance on Berry, 80 Ohio St.3d 371, is misplaced. In Berry, the defendant sought to terminate all further challenges to his conviction and sentence after the Ohio Supreme Court upheld it on direct appeal. His lawyer challenged his competency to make such a decision. The Court ordered a competency hearing and appointed a doctor to evaluate the defendant's condition.
 {¶ 56} This court also addressed the issue in Eley where the defendant made a similar argument to appellant's argument in this case. In analyzing whether Berry applied to a postconviction petitioner sentenced to death, we reasoned:
 {¶ 57} "Berry differs significantly from the present case in that the defendant was forgoing rights that were guaranteed by law. Here, Eley wishes to continue to pursue all avenues available to him to challenge his death sentence. This distinguishable factor is also highlighted inState v. Ashworth (1998), 85 Ohio St.3d 56. In Ashworth, a defendant's competency was called into question when he decided to abandon his right to present mitigating evidence.
 {¶ 58} "* * *
 {¶ 59} "We also note that Berry and Ashworth deal with foregoing rights that are afforded to those defendants who have been criminally accused. Although Eley has been accused and convicted of a capital crime, he was not before the court in a criminal proceeding, rather, a collateral attack of a criminal proceeding. It is well settled that postconviction proceedings are civil proceedings.
 {¶ 60} "* * *
 {¶ 61} "The issue in Berry is slightly different than the issue before us. However, this subtle nuance is significant. Eley is arguing here that the trial court erred by concluding he did not have the right to a competency hearing to determine his ability to assist counsel during postconviction collateral review. Conversely, the issue resolved by the Ohio Supreme Court in the Berry line of cases is that a capital defendant is entitled to a competency hearing when he is seeking to terminate all further challenges to his death sentence." Eley, 7th Dist. No. 99-CA-109.
 {¶ 62} In Eley, we clearly explained why Berry does not apply to a case such as the one at bar. Thus, appellant's reliance onBerry is misplaced.
 {¶ 63} Accordingly, appellant's second assignment of error is without merit.
 {¶ 64} Appellant's third assignment of error states:
 {¶ 65} "THE TRIAL COURT ERRED IN ADOPTING VERBATIM THE FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY THE STATE."
 {¶ 66} Appellant argues that the trial court should not have adopted the findings of fact and conclusions of law that the state submitted word-for-word. He points out that R.C. 2953.21(G) requires the court to make findings of fact and conclusions of law when it denies a postconviction petition. Appellant argues that in capital cases, the court should not merely "rubber stamp" findings of fact and conclusions of law submitted by the state.
 {¶ 67} At oral argument, appellant asserted that this case must be reversed based on the Ohio Supreme Court's recent decision in State v.Roberts, 110 Ohio St.3d 71, 850 N.E.2d 1168, 2006-Ohio-3665. InRoberts, the defendant, like appellant here, argued that the trial court erred in allowing the prosecutor to assist in drafting the court's sentencing opinion. However, the similarity in the facts ends there.
 {¶ 68} In Roberts, the prosecutor aided the trial court in drafting the findings of fact for a death sentence without defense counsel's knowledge. The trial judge had given his notes to the prosecutor and told the prosecutor what he wanted the findings to be. The judge acknowledged that his opinion had to be corrected six or seven times, thus indicating that he had been in ex parte communication with the prosecutor on an ongoing basis.
 {¶ 69} The Ohio Supreme Court held that R.C. 2929.03(F) clearly contemplated that the trial court itself was to draft a death-sentence opinion. Id. at ¶ 156. The Court further opined, "our confidence in the trial court's sentencing opinion is undermined by the fact that the trial judge directly involved the prosecutor in preparing the sentencing opinion and did so on an ex parte basis." Id. at ¶ 159. It further found: "[t]he trial court's consultation with the prosecutor, particularly when undertaken without the knowledge or participation of defense counsel, can neither be ignored nor found to be harmless error." Id. at ¶ 162. Thus, the Court vacated the defendant's death sentence and remanded the matter for resentencing.
 {¶ 70} In this case, however, while the prosecution did draft the findings of fact, it did not do so in an ex parte manner. During oral argument, appellant's counsel admitted that the prosecutor submitted proposed findings of fact to the court and served a copy to appellant's counsel. Appellant's counsel then had the opportunity to, and in fact did, file objections to the prosecutor's findings of fact. Additionally, appellant had the opportunity to submit his own findings of fact for the court to consider. Therefore, in this case, appellant had just as much of a role in the findings of fact as the prosecutor did. This distinguishes the case at bar from Roberts.
 {¶ 71} Furthermore, Roberts dealt with a direct appeal. Instead, we are faced with an appeal on a postconviction petition. The Eleventh District addressed this issue as pertaining to postconviction proceedings in State v. Lorraine (Feb. 23, 1996), 11th Dist. No. 95-T-5196. It rejected the appellant's argument and cited to several other courts that had reached the same conclusion:
 {¶ 72} "In State v. Sowell (1991), 73 Ohio App.3d 672, however, the First District Court of Appeals determined that the trial court's adoption of the state's findings of fact and conclusions of law does not, by itself, deprive the petitioner of a meaningful review of his petition for post-conviction relief. Id. at 676. See, also, State v.Powell (1993), 90 Ohio App.3d 260, 263, State v. Murphy (May 12, 1995), Marion App. No. 9-94-52, unreported. We agree. Without showing that the trial court failed to comply with its statutory duty pursuant to R.C. 2953.21(C), appellant has failed to show that the trial court acted inappropriately by merely agreeing with the state." Id.
 {¶ 73} Likewise, we conclude that the trial court did not err in adopting the state's proposed findings of fact and conclusions of law.
 {¶ 74} Appellant further claims that the trial court could not have conducted an independent review of the record and transcript as required by R.C. 2953.21(C) because the Ohio Supreme Court did not return the record to the trial court until March 10, 2005, two days after the trial court dismissed appellant's petition. He also asserts that the trial court did not maintain a duplicate copy of the file. However, he offers no proof of this assertion.
 {¶ 75} R.C. 2953.21(C) provides in relevant part:
 {¶ 76} "Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript."
 {¶ 77} A review of the Supreme Court's docket reveals that appellant is correct; the Court did not return the case file to the clerk's office until March 10, 2005. However, our clerk's office maintains a duplicate copy of files that it sends to the Supreme Court so that the files are readily available to the trial court when needed. Thus, the trial court had a duplicate copy of the file to review. Additionally, the trial court's judgment entry specifically states that "the Court considered the record available to the Court in case no. 99-CR-192 [appellant's criminal case]," which indicated that it did have a copy of the file to consider. Furthermore, the judge who ruled on appellant's postconviction petition was the same judge who presided over his trial. Thus, the judge also had firsthand knowledge of the trial and surrounding proceedings in addition to the file.
 {¶ 78} Finally, appellant argues that even if the court could simply adopt the state's findings of fact and conclusions of law, in this case they are inadequate. He asserts that they fail to make factual determinations or to cite the appropriate law.
 {¶ 79} Appellant is simply wrong in this argument. A review of the trial court's findings of fact and conclusions of law reveals that the court separately addressed each of appellant's proposed grounds for relief. For each one, it first set out findings of fact and then conclusions of law. The court spent 28 pages addressing appellant's arguments and thoroughly spoke to each one.
 {¶ 80} For these reasons, appellant's third assignment of error is without merit.
 {¶ 81} Appellant's fourth assignment of error states:
 {¶ 82} "THE TRIAL COURT ERRED BY FAILING TO RULE ON APPELLANT'S MOTION FOR VOLUNTARY RECUSAL OF THE TRIAL JUDGE AND THEN DISMISSING THE POST-CONVICTION PETITION WITHOUT A HEARING, THUS TAINTING THE POST-CONVICTION PROCESS."
 {¶ 83} Appellant argues here that the trial judge should have recused herself because she was biased against him. He then argues that because the judge simply adopted the state's findings of fact and conclusions of law, as he argued above, she demonstrated that she did not conduct an impartial and independent review of the case.
 {¶ 84} While appellant asserts that the judge was biased against him, he makes no allegations to support this claim other than to argue that the judge should not have adopted the state's findings of fact and conclusions of law. Since, as discussed above, the court did not err in adopting those findings of fact and conclusions of law, appellant is left with no argument to support this assignment of error. Accordingly, appellant's fourth assignment of error is without merit.
 {¶ 85} Appellant's fifth assignment of error states:
 {¶ 86} "THE TRIAL COURT ERRED IN REFUSING TO ADDRESS MR. AHMED'S PRO SE CLAIMS FOR RELIEF."
 {¶ 87} In its judgment entry, the trial court refused to consider appellant's pro se filings. Appellant filed a pro se postconviction petition and amendment where he raised 19 grounds for relief, several of which raised similar arguments as those raised by counsel. The court reasoned that appellant was not entitled to "hybrid" representation. It stated that appellant had not given a sufficient basis for substitution of counsel and that appellant had not made a valid decision to waive his statutory right to counsel and proceed pro se. It also noted that appellant's counsel had more than discharged their duties and acted professionally in representing appellant.
 {¶ 88} Appellant now argues that the court erred in failing to review his pro se postconviction petition. He states that the court never inquired into why the claims he raised pro se were not raised by his counsel. He argues that the trial court could have only reached such a determination by conducting an evidentiary hearing. Appellant also acknowledges that he does not have a right to hybrid representation on direct appeal. However, he argues that because he has no right to counsel in postconviction proceedings, as in a direct appeal, he may proceed both pro se and with counsel. Finally, appellant argues that he was simply using his pro se petition to preserve issues for review that may be raised in a federal habeas corpus proceeding.
 {¶ 89} In determining that it would not consider appellant's pro se filings, the trial court cited several cases. See State v. Bryant (Dec. 4, 2001), 7th Dist. No. 99CA-135 ("This appellate court has the discretion whether to address arguments raised in a pro se brief when that appellant is represented by counsel who has already filed a brief"); State v. Beaver (1997), 119 Ohio App.3d 385, 695 N.E.2d 332, (appellate court refused to consider assignments of error raised by appellant pro se and without leave of court stating that no accused has the constitutional right to act as his own co-counsel where the state has appointed an attorney to represent him); State v. Thompson (1987),33 Ohio St.3d 1, 6-7, 514 N.E.2d 407 (the defendant had no right, under either State or Federal Constitution, to act as co-counsel on his own behalf during trial).
 {¶ 90} These cases support the trial court's decision not to consider appellant's pro se postconviction petition. Appellant had state-appointed counsel who filed a postconviction petition, and amendments, which raised 17 grounds for relief along with numerous exhibits. The fact that appellant may not have a right to counsel in postconviction, does not give him more rights than on a direct appeal where he does have a right to counsel. Here, he was appointed counsel to handle his postconviction proceedings. Appellant can point to no case law that holds that he is entitled to hybrid representation on postconviction when he is not entitled to such representation during other phases, such as at trial and on direct appeal. Thus, appellant's fifth assignment of error is without merit.
 {¶ 91} Appellant's sixth assignment of error states:
 {¶ 92} "THE TRIAL COURT ERRED IN DENYING RELIEF ON EACH GROUND FOR RELIEF RAISED IN THE PETITION."
 {¶ 93} Appellate review of a trial court's disposition of a petition for postconviction relief is a hybrid presenting mixed questions of law and fact. State v. Smith (Sept. 24, 1999), 11th Dist. No. 98-T-0097;State v. Akers (Sept. 9, 1999), 4th Dist. No. 98-CA-33. The trial court's factual findings will not be reversed unless they are against the manifest weight of the evidence. Judgments will not be reversed, as being against the manifest weight of the evidence if they are supported by some competent, credible evidence. Gerijo, Inc. v. Fairfield (1994),70 Ohio St.3d 223, 226, 638 N.E.2d 533; C.E. Morris Co. v. Foley Constr.Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. Upon accepting such findings of fact, an appellate court then independently determines the propriety of the trial court's conclusions of law.
 {¶ 94} In postconviction, the petitioner bears the initial burden of presenting evidentiary documents containing sufficient operative facts to demonstrate a denial of a constitutional right and resulting prejudice. State v. Rector, 7th Dist. No. 04-CA810, 2005-Ohio-6944, at ¶ 16. Matters which were or could have been raised on direct appeal may not be considered in postconviction proceedings, as such matters are barred by the doctrine of res judicata. State v. Perry (1967),10 Ohio St.2d 175, 226 N.E.2d 104, at paragraphs eight and nine of the syllabus.
 {¶ 95} Appellant argues that the trial court erred in denying each of his 17 grounds for relief. For ease of discussion, this assignment of error is broken down into subsections.
 Prosecutorial Misconduct {¶ 96} In his first ground for relief appellant raised the issue of prosecutorial misconduct. Appellant is from Pakistan. He alleged that the prosecutor prejudicially and repeatedly argued that the murders were honor killings. By doing so, appellant argues that the prosecutor appealed to the jury's passions and prejudices to obtain a conviction. Appellant relied on the affidavit of Dr. Anita Weiss, who provided information about honor killings and the Pakistani culture, to argue that the murders he was convicted of did not meet the definition of honor killings. (Ex. B).
 {¶ 97} Appellant argues that the prosecutor simply made up the argument at trial that these were honor killing despite no such evidence.
 {¶ 98} Since appellant could have raised this issue in his direct appeal, it is barred by res judicata. But even if this claim was not barred, appellant has not demonstrated any prejudice. The state was required to prove that appellant "purposely, and with prior calculation and design, cause[d] the death of another" and that he "purposely cause[d] the death of another who is under thirteen years of age." R.C. 2903.01(A)(C). The state was not required to prove that appellant committed these murders as honor killings. Thus, whether or not the state introduced evidence that the murders in this case were honor killings, it would not have affected the trial's outcome.
 {¶ 99} In his eighth ground for relief, appellant argued that the prosecutor committed misconduct during the mitigation phase by arguing non-statutory factors, specifically the manner in which the victims were killed and the brutality of the murders, and inviting the jury to speculate about facts not in evidence. He relied on affidavits of two jurors who stated that they considered the severity of the victims' injuries. (Ex. J, K).
 {¶ 100} Appellant argues that the prosecutor's interjection of nonstatutory aggravating factors deprived him of a fair sentencing hearing.
 {¶ 101} Appellant raised this issue in his direct appeal. The Supreme Court concluded that the prosecutor's comments did not affect appellant's substantial rights and that the comments did not, as appellant argued, invite the jury to weigh the nature and circumstances of the offenses as aggravating circumstances. Ahmed, 103 Ohio St.3d at ¶ 133-134. Thus, this issue is barred by res judicata.
 {¶ 102} Furthermore, the jurors' affidavits upon which appellant relied are not admissible. Evid. R. 606(B) states in pertinent part:
 {¶ 103} "Upon an inquiry into the validity of a verdict or indictment,a juror may not testify as to * * * the effect of anything upon his orany other juror's mind or emotions as influencing him to assent to ordissent from the verdict or indictment or concerning his mental processes in connection therewith. * * *. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes." (Emphasis added.)
 {¶ 104} Courts have held that such affidavits are inadmissible in postconviction. See State v. Jackson, 10th Dist. No. 01AP-808, 2002-Ohio-3330, at ¶ 59; State v. Hoffner, 6th Dist. No. L-01-1281, 2002-Ohio-5201, at ¶ 30. Thus, even if appellant's argument was not barred by res judicata, he would not be entitled to relief on this ground because the evidence on which he relies is inadmissible.
 {¶ 105} Accordingly, the trial court did not err in dismissing appellant's grounds for relief based on prosecutorial misconduct.
 Ineffective Assistance of Counsel {¶ 106} "Where ineffective assistance of counsel is alleged in a petition for postconviction relief, the defendant, in order to secure a hearing on his petition, must proffer evidence which, if believed, would establish not only that his trial counsel had substantially violated at least one of a defense attorney's essential duties to his client but also that said violation was prejudicial to the defendant." State v.Cole (1982), 2 Ohio St.3d 112, 114, 443 N.E.2d 169.
 {¶ 107} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. Strickland v. Washington (1984),466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; State v. Bradley
(1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. Second, appellant must demonstrate that he was prejudiced by counsel's performance. Id. To show that he has been prejudiced by counsel's deficient performance, appellant must prove that, but for counsel's errors, the result of the trial would have been different.Bradley, 42 Ohio St.3d at paragraph three of the syllabus.
 {¶ 108} In his second ground for relief, appellant alleged that his trial counsel was ineffective because counsel failed to object to the prosecutorial misconduct discussed above. He argued that there was no strategic reason for counsel not to object to the prosecutor's improper arguments. The failure to object, appellant contended, allowed the jury to consider issues of race, culture, and religion, which had no bearing on his guilt or innocence.
 {¶ 109} In his direct appeal, appellant also argued that his counsel was ineffective for failing to object to prosecutorial misconduct. The Court found this alleged failure did not affect the outcome of appellant's trial. Ahmed, 103 Ohio St.3d at ¶ 164. Thus, this argument is barred by res judicata.
 {¶ 110} In his third ground for relief, appellant claimed that his counsel was ineffective because counsel failed, during the mitigation phase of the trial, to present evidence of his background and cultural and religious beliefs. He argued that counsel should have investigated his background and called a cultural expert to testify as to these matters.
 {¶ 111} Appellant alleges that had counsel presented evidence as to whom he was as a person, at least one juror would have voted for a life sentence instead of death.
 {¶ 112} But appellant cites to nothing about his cultural or religious background that was not covered by other witnesses. Additionally, part of defense counsel's mitigation strategy was to show that appellant suffered from a mental disease or defect that caused him to be delusional. Counsel called a psychologist who testified at length regarding appellant's mental condition and called two lay witnesses who testified that appellant believed the CIA was bugging his apartment. The prosecutor attempted to rebut this testimony by asking whether it was possible that appellant's fears and suspicions could be considered normal for someone from Pakistan who suffered religious persecution. It is possible that testimony from a cultural expert, such as Dr. Weiss, would have supported the prosecutor's position because her testimony would have shown that appellant's paranoia and delusions were normal for someone from his background. Therefore, defense counsel's mitigation defense of a psychological disorder would be seriously undermined.
 {¶ 113} In his fourth ground for relief, appellant claimed that counsel was ineffective because he failed to arrange for a proper translator during mitigation. Appellant's sister-in-law testified for appellant during mitigation. She is from Pakistan and is not fluent in English. Thus, she needed a translator for her testimony. Appellant argued that the translator his counsel used was not fluent in the Urdu dialect, which the witness spoke. Therefore, appellant argued that the jury did not hear a proper translation of the witness's testimony. Appellant again relied on Dr. Weiss's affidavit in which she stated that there was some miscommunication between the translator and witness resulting in a flawed translation. Additionally, appellant attached a copy of a note that he passed to his counsel during his sister-inlaw's testimony in which he told his counsel that the translator was mistranslating.
 {¶ 114} Appellant argues that his counsel's failure to correct this miscommunication was error.
 {¶ 115} These issues too were addressed in appellant's direct appeal. The Court found that appellant's assertions that a cultural expert and a foreign-language interpreter would have helped his defense were speculative at best. Ahmed, 103 Ohio St.3d at ¶ 157.
 {¶ 116} Additionally, appellant relied on two affidavits to support his contention that the interpreter misinterpreted his sister-in-law's mitigation testimony. First, he relied on Dr. Weiss. However, Dr. Weiss did not hear the testimony. She only reviewed the English version of the testimony that was included in the transcript. Thus, she could only speculate as to what was said. Appellant also relied on the affidavit of his sister-in-law, Shehida Ahmed. She stated that during her testimony, the translator did not properly translate the questions. However, she failed to give any specific examples of this alleged mistranslation or to demonstrate how, if properly translated, her testimony would have affected the outcome of appellant's sentence.
 {¶ 117} In his ninth ground for relief, appellant alleged that his counsel was ineffective for failing to object to statements made by the prosecutor. Specifically, appellant took issue with the statements that "you are not going into somebody's basement to slash somebody's throat" and "I wonder if those four innocent victims were given a chance to pray before their throats were slashed"" and to the prosecutor's question as to what weight the jury would assign to "four innocent lives taken the way they were taken." (Mitigation Tr. 176, 180, 182).
 {¶ 118} Appellant argues that he was prejudiced because the prosecutor told the jury to use the nature and circumstances of the crime as a reason to impose a death sentence.
 {¶ 119} Appellant also raised this argument in his direct appeal and the Court found it to be without merit. Ahmed, 103 Ohio St.3d at ¶ 133, 164. Thus, it is barred by res judicata.
 {¶ 120} In his tenth ground for relief, appellant claimed he was denied effective assistance of counsel because his counsel repeatedly made references to the nature and circumstances of the offense as an aggravating factor that had to be overcome by mitigating factors. Appellant relied on the affidavits of two jurors in an attempt to show that they relied on these non-statutory aggravating factors in reaching their decision to recommend a death sentence. (Ex. J, K).
 {¶ 121} Appellant argues that counsel's argument made the jurors consider non-statutory aggravating factors.
 {¶ 122} This argument should have been raised on direct appeal. Thus, it is barred by res judicata. Furthermore, as explained above, the jurors' affidavits, upon which appellant relies, are inadmissible in postconviction to show the effect of anything on their minds that influenced them to assent to the verdict. Evid. R. 606(B).
 {¶ 123} In his eleventh ground for relief, appellant made three separate arguments. At trial, the state presented evidence that appellant booked a flight to Pakistan after the murders and was arrested at JFK Airport in New York. Appellant first argued that his counsel failed to present evidence that his father, who lived in Pakistan, was ill and that appellant planned to travel to Pakistan to pick up his father and bring him back to the United States before his father's visa expired. Appellant submitted his own affidavit in support of these facts along with a photocopy of his father's visa. (Ex. L, M).
 {¶ 124} A copy of his father's visa does not explain why appellant signed over his car and, more importantly, the care of his children to a travel agent he had never met before. Furthermore, appellant's counsel attempted to prove that appellant was merely traveling to Pakistan to pick up his ill father by introducing evidence that appellant purchased a round-trip ticket and that his father was ill. (Trial Tr. 438, 464-65). Thus, counsel was not ineffective for failing to introduce the above mentioned evidence.
 {¶ 125} Second, appellant argued that his counsel should have introduced a credit card statement that showed that his card was used in Columbus on September 11, 1999. At trial, the state argued that on September 11, appellant drove from his apartment in Columbus to his marital residence in St. Clairsville, committed the murders, and then drove to New York. Appellant argues that his counsel should have introduced his credit card statement to rebut this theory. He submitted the statement for support. (Ex. N).
 {¶ 126} The credit card statement does not include a time which the card was used, only the date September 11, 1999. Appellant could have used the card in Columbus around midnight and made it to St. Clairsville to commit the murders well before 3:45 a.m. Another possibility is that someone other than appellant used his credit card in Columbus that day. Thus, the credit card statement would not have exonerated appellant. Furthermore, appellant did not submit any evidence that he informed his counsel about this credit card statement and that counsel refused to use it. Hence, he cannot show that his counsel erred in this regard.
 {¶ 127} Finally, appellant argued that counsel should have introduced two letters — one that he wrote to a religious leader in which he expressed remorse for asking for a paternity test for his oldest son and stated that he had not wanted to do so but that his attorney decided a paternity test should be conducted and another from the religious leader to Lubania's father repeating the same. He submitted copies of the letters. (Ex. O). Appellant argued that these letters, along with testimony from his religious leader, would have contradicted the state's portrayal of him as an obsessive, controlling person.
 {¶ 128} The letters appellant wished counsel to introduce would have been inadmissible hearsay. Additionally, Grace Hoffman, Lubaina's divorce attorney, read excerpts of appellant's deposition for the jury. In his deposition, appellant stated that he never doubted his son's paternity and that he only asked for a paternity test at the urging of his attorney. (Trial Tr. 72-73). Furthermore, appellant did not present any evidence that he informed his counsel about these letters prior to trial. Thus, it is hard to see how counsel could have been ineffective for failing to introduce them.
 {¶ 129} For all of the above reasons, the trial court did not err in denying appellant's eleventh ground for relief.
 {¶ 130} In his sixteenth ground for relief, appellant argued that counsel was ineffective for failing to call additional mitigation witnesses to testify as to his character, history, and background. For support he submitted the affidavit of Dr. Abdus Malik in which Dr. Malik stated that appellant was a timid man not prone to outbursts, that he never observed any marital problems between appellant and his wife, that appellant would not have been shamed for a divorce, that appellant was religious, and that he would have testified to these matters if appellant's attorneys had contacted him to do so. (Ex. T).
 {¶ 131} Appellant argues that his counsel failed to conduct a proper investigation to find witnesses who would testify as to his background, religion, and character.
 {¶ 132} Appellant submitted no evidence that he informed his counsel about Dr. Malik or that Dr. Malik was willing to testify on his behalf regarding the subjects set out above. Thus, it is difficult to understand how counsel could have erred in not contacting him.
 {¶ 133} Furthermore, other witnesses testified as to appellant's character and that he would not have been shamed by his community for getting a divorce. Shehida Ahmed testified during mitigation that appellant treated family members well and was helpful towards children. (Mit. Tr. 78-79). She further stated that appellant helped others in his community. (Mit. Tr. 79). Additionally, she stated that appellant was a religious man. (Mit. Tr. 79-80). And she testified that appellant was devoted to his family. (Mit. Tr. 80). Furthermore, at trial, Saeed Khan, testified that appellant would not be shamed by a divorce the way a woman would, but instead appellant could "find as many women" as he wanted to. (Trial Tr. 159). Thus, there was evidence on the record similar to that which Dr. Malik would have testified to.
 {¶ 134} As to all of these grounds, appellant has not presented any evidence that he was prejudiced by his counsel's alleged ineffectiveness. He has not pointed to any evidence that indicates that the outcome of the trial or the penalty phase would have been different had his counsel performed in the way he saw fit. For this reason, as well as the other reasons stated above, the trial court did not err in denying appellant relief based on his ineffective assistance of counsel claims.
 Eighth Amendment Claim Regarding Inaccurate Translation {¶ 135} In his fifth ground for relief, appellant argued that because the translator misinterpreted his sister-in-law's testimony, the jury was unable to consider the mitigation evidence she presented. He again relied on Dr. Weiss's affidavit for support.
 {¶ 136} Appellant argues that because the jury could not fully understand his sister-in-law's testimony, he was deprived of his rights to present mitigation evidence and to a fair and impartial sentencing hearing.
 {¶ 137} This ground for relief is basically a restatement of appellant's fourth ground for relief. As stated above, the affidavits appellant relied on in support of this alleged error do not demonstrate how he was prejudiced. Dr. Weiss never heard Shehida Ahmed's testimony. Therefore, she could only hypothesize as to what Shehida testified to. And Shehida, in her affidavit, gave no examples of what part of her testimony was misinterpreted and what that testimony should have been interpreted to mean. Furthermore, appellant should have raised this issue in his direct appeal. Therefore, it is barred by res judicata. Accordingly, the trial court properly denied appellant's fifth ground for relief.
 Jury Conduct {¶ 138} In his sixth ground for relief, appellant alleged that the jurors failed to follow the court's instruction that they only consider the statutory aggravating factors. For support, appellant referred to the affidavit of assistant state public defender, Kathryn Sandford, who was present at interviews with three of the jurors. (Ex. C). She stated that those three jurors stated that they based their decision to vote for the death penalty on such things as the gruesome crime scene photographs, the viciousness of the crime, and the age and frailty of appellant's father-in-law.
 {¶ 139} Appellant argues that he was denied a fair sentencing hearing because the jury failed to weigh the statutory aggravating factors against the mitigating factors.
 {¶ 140} In State v. Hessler (2000), 90 Ohio St.3d 108,734 N.E.2d 1237, the Court held that a juror's and an alternate juror's affidavits could not be considered when ruling on a motion for a new trial or evidentiary hearing. The affidavits stated that the juror signed the verdict voting for death only to avoid continued harassment by other jurors. The Court applied the firmly established rule that flatly prohibits the admission of juror testimony to impeach a jury verdict, known as the aliunde rule, which is embodied in Evid. R. 606(B). Id. at 123. It went on to state: "The purpose of the aliunde rule is to maintain the sanctity of the jury room and the deliberations therein. The rule is designed to ensure the finality of jury verdicts and to protect jurors from being harassed by defeated parties." (Internal citation omitted.) Id. Because the affidavits offered internal evidence of the jury's deliberations in order to impeach the sentencing recommendations, the Court held that the trial court correctly overruled the motion for a new trial or evidentiary hearing.
 {¶ 141} Likewise, appellant offered an affidavit containing what alleged to be internal evidence of the jury's deliberations. In this case, however, the affidavit was not from a juror but from a third party who re-stated what the jurors had told her about their deliberations. The reasoning of Hessler and the aliunde rule still apply. In both cases, the defendant offered affidavits based on jurors' statements as to why they concluded that the death sentence was warranted. Whether the information came from the jurors themselves or from another person in whom the jurors confided, either way the finality of the verdict and the sanctity of the jury deliberations are affected. Furthermore, in this case, Sandford stated in her affidavit that the jurors she referred to refused to sign affidavits, which shows that they did not wish to be harassed by appellant. And Sandford's affidavit was based completely on hearsay. Thus, it was likely inadmissible. Based on the foregoing, the court did not err in rejecting appellant's sixth ground for relief.
 {¶ 142} In his seventh ground for relief, appellant argued that the jury did not understand the court's instructions regarding aggravating and mitigating circumstances. He again relied on Sandford's affidavit. He also relied on an affidavit from Michael Geis, a linguistics professor, who stated that the Ohio Jury Instructions on aggravating and mitigating circumstances are overly broad and allow jurors to consider non-statutory aggravating factors. (Ex. H).
 {¶ 143} Appellant argues that the jury instructions deprived him of a fair sentencing hearing because the jurors did not understand the law.
 {¶ 144} Other courts have rejected the same argument appellant advances here based on res judicata. See State v. Hughbanks, 1st Dist. No. C010372, 2003-Ohio-187, at ¶ 18 ("The affidavits of the linguistics professor and the defense attorney presented `essentially * * * notarized argument[s]' that could have been advanced at trial or on appeal. Therefore, neither affidavit constituted outside evidence that precluded dismissal of the tenth claim under the doctrine of res judicata"); State v. Phillips, 9th Dist. No. 20692, 2002-Ohio-823 ("the inclusion of Dr. Geis' affidavit does not immunize Mr. Phillips from the operation of res judicata, because the linguistic arguments made by Mr. Geis in his affidavit could have been argued on direct appeal; therefore, the affidavit is only of marginal significance in determining whether the jury instructions were erroneous, misleading, or confusing"). These courts are correct. Appellant could have raised this argument in his direct appeal and he failed to do so. Therefore, appellant's seventh ground for relief is barred by res judicata.
 Vienna Convention {¶ 145} In his twelfth ground for relief, appellant argued that his death sentence is void since he was not advised of his rights under the Vienna Convention on Consular Rights. He asserted that because he is a citizen of both the United States and of Pakistan, he should have been advised of his right of access to his Pakistani consul. He argued that had he been informed of this right, he could have contacted his consul who would have been of assistance during the mitigation phase of trial regarding appellant's culture.
 {¶ 146} Appellant argues that contact with his consul would have provided him with the resources to avoid his ineffective assistance of counsel claims and provided him with the tools necessary to ensure that a qualified Urdu-speaking translator was available.
 {¶ 147} This claim is barred by res judicata because appellant already raised it in his direct appeal. There, the Ohio Supreme Court found it to be without merit based on appellant's dual citizenship and the fact that he failed to raise the argument before the trial court.Ahmed, 103 Ohio St.3d at ¶ 51-55.
 Competency/Sanity {¶ 148} In his thirteenth ground for relief, appellant argued that he was incompetent during his trial and sentencing and was unable to assist in his defense. For support, appellant attached copies of various documents and motions that he filed pro se, which he argues evidence his lack of competency. (Ex. Q).
 {¶ 149} Appellant contends that the trial court erred in dismissing this matter without granting discovery and holding a hearing because "the experiences of every judge, attorney, and other person in dealing with Mr. Ahmed during the course of this litigation" beg the question of his competency.
 {¶ 150} This claim is barred by res judicata. Appellant raised the identical claim in his direct appeal. The Ohio Supreme Court found it to be without merit. Ahmed, 103 Ohio St.3d at ¶ 56-69.
 {¶ 151} In his fourteenth ground for relief, appellant argued that he will be incompetent and insane at the time of his execution. Therefore, he argued that his execution will violate his Eighth Amendment rights since he will be unable to understand the connection between his crimes and his punishment.
 {¶ 152} Appellant asserts that because his execution date may be set at any time or he may choose to terminate his appeals, this issue is ripe for review.
 {¶ 153} R.C. 2949.28 sets out the procedure to follow when there is an inquiry into the sanity of a convict. "Insane" as used in that section specifically refers to when "the convict in question does not have the mental capacity to understand the nature of the death penalty and why it was imposed upon the convict." R.C. 2949.28(A). "If a convict sentenced to death appears to be insane, the warden or the sheriff having custody of the convict, the convict's counsel, or a psychiatrist or psychologist who has examined the convict shall give notice of the apparent insanity to * * * the judge who imposed the sentence upon the convict or, if that judge is unavailable, to another judge of the same court of common pleas." R.C. 2949.28(B)(1)(a). The remainder of R.C. 2949.28 sets out the procedure for the court to follow. If appellant's sanity is in question, he must avail himself of the procedure set out in R.C. 2949.28.
 {¶ 154} Furthermore, this issue is not ripe for review. There is no indication in the record that appellant's execution date is set and approaching. Thus, whether appellant is insane or incompetent now could very well change by the time his actual execution date arrives.
 {¶ 155} Therefore, the trial court properly dismissed appellant's fourteenth ground for relief.
 Jury Selection {¶ 156} In his seventeenth ground for relief, appellant argued that the jury venire was not representative of the community. He asserted that because approximately five percent of Belmont County is non-Caucasian, five percent of the venire should have been non-Caucasian. He attached a Belmont County census report. (Ex. D). Appellant stated that in a jury venire of 200 people, at least ten people should have been non-Caucasian. He asserted that his jury venire included only one non-Caucasian.
 {¶ 157} Appellant contends that the trial court erred in dismissing this claim based on res judicata because while the venire makeup was known on direct appeal, the statistical information was not part of the record and therefore the claim was not capable of review.
 {¶ 158} Firstly, this claim is barred by res judicata. Appellant should have, but failed to raise it in his direct appeal.
 {¶ 159} Secondly, even if not barred, appellant's claim lacks merit. In order to establish a claim for a violation of the Sixth Amendment's fair-cross-section requirement, the defendant must demonstrate "'(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.'" State v. Jackson, 107 Ohio St.3d 53,836 N.E.2d 1173, 2005-Ohio-5981, at ¶ 65, quoting Duren v. Missouri (1979),439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579.
 {¶ 160} Appellant made no attempt whatsoever to present any evidence as to the third element — underrepresentation due to systematic exclusion. Underrepresentation on a single venire is notsystematic exclusion. State v. McNeill (1998), 83 Ohio St.3d 438, 444,700 N.E.2d 596. Appellant did not provide any evidence that jury venires systematically excluded non-Caucasians. Furthermore, appellant only alleged that "non-Caucasians" were not represented in the venire. It does not seem that "non-Caucasians" is a distinctive group such as African Americans or Hispanic Americans. Thus, even if appellant's claim was not barred by res judicata, it fails because he cannot make the necessary showing pursuant to Jackson and Duren.
 {¶ 161} Accordingly, the trial court did not err in dismissing appellant's seventeenth ground for relief.
 Cumulative Error {¶ 162} In his fifteenth ground for relief, appellant argued that the cumulative effects of the errors he presented warranted a new trial or, at the least, discovery and an evidentiary hearing.
 {¶ 163} Appellant asserts that the trial court failed to analyze this claim and simply adopted the state's findings of fact and conclusions of law.
 {¶ 164} Since none of appellant's alleged errors have merit, there is no cumulative error to examine. Thus, the trial court properly found appellant's fifteenth ground for relief to be meritless.
 {¶ 165} Based on the foregoing analysis of each of appellant's grounds for relief, appellant's sixth assignment of error is without merit.
 {¶ 166} For the reasons stated above, the trial court's judgment is hereby affirmed.
Vukovich, J., concurs.
DeGenaro, J., concurs.